1 | KEITH E. EGGLETON, State Bar No. 159842
RODNEY G. STRICKLAND, State Bar No. 161934
2 | ANTHONY J WEIBELL, State Bar No. 238850
WILSON SONSINI GOODRICH & ROSATI
3 | Professional Corporation
650 Page Mill Road
4 | Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
5 | Facsimile: (650) 565-5100
Email: keggleton@wsgr.com;
6 | rstrickland@wsgr.com; aweibell@wsgr.com

7 | Attorneys for Defendant
RUDOLPH TECHNOLOGIES, INC.

8 |

**FILED**

2008 MAY -2  A II: 20

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

E-FILING

ADR

9 |                    UNITED STATES DISTRICT COURT

10 |                   NORTHERN DISTRICT OF CALIFORNIA

11 |                         SAN JOSE DIVISION

12 | MEHRDAD NIKOONAHAD,                         Case No. C08 02290

13 |              Plaintiff,                )
                                            )   **NOTICE OF REMOVAL**
14 |       v.                              )                              PVT
                                            )
15 | RUDOLPH TECHNOLOGIES, INC. and          )
     DOES 1-25, inclusive,                   )
16 |                                          )
                 Defendants.                 )
17 | _____ )

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

1    PLEASE TAKE NOTICE that defendant Rudolph Technologies, Inc. ("Rudolph")

2  hereby removes the civil action pending in the Superior Court of the State of California, County

3  of Santa Clara, styled *Nikoonahad v. Rudolph Technologies, Inc.*, case number 1-08-CV-108700,

4  to the United States District Court for the Northern District of California, San Jose Division.

5  Defendant Rudolph will promptly file a Notice of this Removal with the Clerk of the Superior

6  Court for Santa Clara County and serve the Notice on all parties.

7                         **GROUNDS FOR REMOVAL JURISDICTION**

8        1.    Pursuant to 28 U.S.C. § 1446, Rudolph invokes this District Court's jurisdiction

9  under 28 U.S.C. § 1441 (providing that defendants may remove any civil action, filed in state

10  court, of which the District Courts of the United States have original jurisdiction) and 28 U.S.C.

11  § 1332 (granting the District Courts original jurisdiction in cases involving parties of diverse

12  citizenship).

13        2.    On March 21, 2008, plaintiff Mehrdad Nikoonahad filed a complaint (the

14  "Complaint") against Rudolph in the Superior Court of the State of California, County of Santa

15  Clara, purportedly alleging claims for (1) Breach of Written Contract; (2) Breach of Implied

16  Covenant of Good Faith and Fair Dealing; (3) Breach of Fiduciary Duty; and (4) Promissory

17  Fraud.  The Complaint is attached hereto as Exhibit 1.

18        3.    On April 4, 2008, Rudolph received a copy of the Summons and Complaint, via

19  certified mail, return receipt requested, which service would have been effective no sooner than

20  ten days after mailing pursuant to California Code of Civil Procedure Section 415.40 ("Service

21  of a summons by this form of mail is deemed complete on the 10th day after such mailing.").  A

22  copy of the Summons is attached hereto as Exhibit 2.

23        4.    At the time of filing this action, Plaintiff was and still is a citizen of the State of

24  California and not a citizen of Delaware or New Jersey. *See, e.g.*, Ex. 1 ¶ 1.

25        5.    At the time of filing this action, Defendant Rudolph was and still is a citizen of

26  Delaware and New Jersey, due to its incorporation in Delaware and due to the location of its

27  headquarters and principal place of business in New Jersey. *See, e.g.*, Ex. 1 ¶ 3. Defendant is

28

1  not, and was not at the time of filing this action, a citizen of California, the state in which this

2  action is pending.

3      6.    The allegations in the Complaint are based upon Rudolph's alleged breach of an

4  agreement ("the Agreement") between the parties, which Agreement was attached by Plaintiff to

5  his Complaint and expressly incorporated by reference into the Complaint.  Compl. ¶ 8.

6  Payments made by Rudolph to Plaintiff pursuant to the allegedly breached Agreement total

7  $100,000.  *Id.* ¶ 11; *id.* Ex. A ¶ 5.1.1.  Plaintiff further alleges that Rudolph's alleged breach of

8  the Agreement deprived Plaintiff of certain royalties to which he would otherwise have been

9  entitled.  *See id.* ¶ 11; *id.* Ex. A ¶ 5.3.1.  In a pre-suit demand letter to Rudolph dated October 30,

10  2007, Plaintiff claimed that "the amount of damages he has suffered because of Rudolph's

11  conduct" was allegedly benchmarked at $5,000,000.[1]  Accordingly, the amount in controversy

12  here exceeds the $75,000 statutory minimum for diversity jurisdiction.

13      7.    Based on these allegations, Defendant Rudolph invokes this District Court's

14  diversity subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1441 and 1332.

15      8.    Removal pursuant to 28 U.S.C. § 1446(b) is timely, as less than thirty (30) days

16  have elapsed between Plaintiff's service of the Complaint on Rudolph and the filing of this

17  Notice of Removal.

18      9.    Venue in this district is proper under 28 U.S.C. § 1441 because this District

19  includes the California Superior Court for Santa Clara County, the forum in which the removed

20  action was pending.

21

22

23

24

25  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [1] The Court may properly look to a pre-suit demand letter to determine the amount in
    controversy for removal purposes.  *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 839 (9th Cir. 2002)
26  (removal was proper where defendant alleged in notice of removal that demand letter from
    plaintiff had stated claim was worth $100,000); *Matheson v. Progressive Specialty Ins. Co.*, 319
27  F.3d 1089, 1090-1091 (9th Cir. 2003) (Ninth Circuit permits courts to consider "facts presented
    in the removal petition as well as any summary-judgment-type evidence relevant to the amount
28  in controversy at the time of removal."); *Arellano v. Home Depot U.S.A., Inc.*, 245 F. Supp. 2d
    1102, 1108 (S.D. Cal. 2003) (relying upon demand letter found to reflect a reasonable estimate
    of plaintiff's damages, to conclude that requisite amount was in controversy).

1

**INTRADISTRICT ASSIGNMENT**

2         10.     Pursuant to Civil Local Rule 3-2, assignment of this action to the San Jose

3   Division of this District Court is proper because this action is being removed from the California

4   Superior Court for Santa Clara County.

5

**PLEADINGS RECEIVED BY DEFENDANT**

6         11.     As of the date of this Notice of Removal, the following process, pleadings and/or

7   orders have been served on Rudolph in connection with this action:

8         a.     Complaint, attached hereto as Exhibit 1;

9         b.     Summons, attached as Exhibit 2.

10

11   Dated:  May 2, 2008                     WILSON SONSINI GOODRICH & ROSATI
                                              Professional Corporation
12

13                                           By:  _____
14                                                Keith Eggleton

15                                           Attorneys for Defendant
                                              RUDOLPH TECHNOLOGIES, INC.
16

17

18

19

20

21

22

23

24

25

26

27

28

1  John W. Clark (CSB #036664)
   Attorney at Law
2  2600 El Camino Real, Suite 410
   Palo Alto, California 94306
3  Tel.: (650) 354-3605
   Fax: (650) 354-3606
4
5  Ardell Johnson, Esq. (CSB #095340)
   Korda, Johnson & Wall LLP
6  66 East Santa Clara Street, #250
   San Jose, CA 95113
7  Tel: (408) 494-0700
   Fax: (408) 494-0707
8  Attorneys for Plaintiff MEHRDAD NIKOONAHAD

**UCB**

FILED  Santa Clara Co
03/21/08  10:08am
Kiri Torre
Chief Executive Offic
By: jcaonguyen DTSCIV
R#200800029523
CK                $320.00
TL                $320.00

9
10              SUPERIOR COURT OF THE STATE OF CALIFORNIA:  1-08-CV-108700
11                          COUNTY OF SANTA CLARA
12                          UNLIMITED JURISDICTION
                                                              J. Cao-Nguyen
13
14  MEHRDAD NIKOONAHAD,                    )   Case No. **1 0 8 C V 1 0 8 7 0 0**
                                           )
15          Plaintiff,                     )   **COMPLAINT FOR BREACH OF**
                                           )   **CONTRACT, BREACH OF**
16      v.                                 )   **FIDUCIARY DUTY AND FRAUD**
                                           )
17  RUDOLPH TECHNOLOGIES, INC. and         )
    DOES 1-25, inclusive,                  )
18                                         )
            Defendants.                    )
19                                         )
                                           )
20                                         )
21
22                          **FIRST CAUSE OF ACTION**
                            **(Breach of Written Contract)**
23      Plaintiff alleges:
24      1.     Plaintiff MEHRDAD NIKOONAHAD ("Nikoonahad") is a resident of the State
25  of California.
26      2.     At all times herein alleged Nikoonahad held a doctorate degree in electronic
27  engineering, was the inventor on numerous patents and he is generally recognized by
28  semiconductor equipment manufacturers as an expert in the field of wafer inspection and

1  measurement used in semiconductor manufacturing. In 2006, Nikoonahad was the inventor an
2  owner of intellectual property that included U.S. Patent No. 6,867,862, U.S. Patent Application
3  No. 60/641,979 and International PCT Publication No. WO 2004/046655 A3, all of which, in
4  lay terms, involve techniques for taking measurements of silicon wafers, using a technique
5  generally referred to as Optical Critical Dimension (OCD) measurement or Scatterometry.

6      3.    Defendant RUDOLPH TECHNOLOGIES, INC. ("RTEC") is a Delaware
7  corporation with its headquarters in the State of New Jersey. RTEC designs, develops,
8  manufacturers and supports high-performance, process-control equipment used in
9  semiconductor device manufacturing. RTEC does extensive business worldwide and in Santa
10 Clara County, California.

11     4.    Plaintiff does not know the true names and capacities of the defendants sued
12 herein as DOES 1-25, inclusive, but allege that each of the defendants sued herein by said
13 fictitious name is legally responsible for the damages alleged by Plaintiff. Plaintiff will amend
14 this complaint to state their true names and capacities when ascertained.

15     5.    In early January 2005, RTEC engaged Nikoonahad to consult in the field of
16 optical metrology for CD measurement with reference to semiconductor manufacturing for the
17 purpose of assisting RTEC to identify a technical strategy and roadmap for RTEC to develop a
18 product for entry into the OCD market. The stated goal for Nikoonahad's consulting was to
19 identify product opportunities using RTEC's existing technology that would allow it to deliver a
20 revenue generating product in 2005.

21     6.    During Nikoonahad's consulting he proposed existing technologies for RTEC to
22 consider and he also disclosed new technologies for which he had applied for patents with the
23 understanding that RTEC would have to license the latter technologies from him if it wished to
24 use them. Nikoonahad's consulting arrangement with RTEC concluded in April 2005 at which
25 time Nikoonahad informed RTEC he would be continuing to perfect the technologies that he
26 had developed and that RTEC should contact him if and when it wanted to use those
27 technologies.

28

7.    Approximately a year later, RTEC expressed interest in Nikoonahad's intellectual property and as a result, on or about May 25, 2006, RTEC entered into a consulting agreement with Nikoonahd for a two month term pursuant to which RTEC would consult Nikoonahad regarding marketing activities related to new RTEC products. In order to explore Nikoonahad's intellectual property in depth RTEC entered into a non-disclosure agreement pursuant to which Nikoonahad disclosed it.

8.    RTEC expressed a desire to acquire Nikoonahad's intellectual property. After negotiating for more than five months Nikoonahad and RTEC entered into a written contract entitled "Exclusive Patent License and Assignment Agreement" (hereafter the "Agreement") effective on September 12, 2006. A true copy of the Agreement is attached as Exhibit A and incorporated by reference.

9.    Pursuant to the Agreement Nikoonahad licensed his technology to RTEC in exchange for a small cash payment in two installments and royalty payments based on RTEC's sale of products based on the technology and he agreed to provide consulting services at a reduced rate to assist RTEC's product development.

10.    Nikoonahad performed his part of the Agreement including, but not limited to, disclosing to RTEC his inventions and the technical information and know-how necessary for RTEC to use the inventions, and making himself available to RTEC for consulting, and consulting with RTEC, toward the development of product using the licensed technology and the other subject matters about which he agreed to consult in the Agreement

11.    RTEC breached the contract in that it continuously failed to perform its obligations, delayed and frustrated the contract objective of developing product in that, among other things,  RTEC failed to conclude its due diligence investigation and make the first installment payment to Nikoonahad in a timely manner;  RTEC failed to pay the second installment to Nikoonahad in a timely manner;  RTEC failed to engage or utilize Nikoonahad's consulting services for developing products incorporating the licensed technology and failed to communicate with, or provide information to Nikoonahad concerning the development of products and the prosecution of his patent application; Nikoonahad is informed and believes,

1    RTEC failed to use reasonable efforts to develop products incorporating the licensed technology

2    and instead used Nikoonahad's disclosures and consulting services for the purpose of

3    developing products that would not require the payment of royalties under the Agreement;

4    RTEC refused to perform the dispute resolution provision; and, RTEC terminated the license

5    but retained the subject intellectual property for its own benefit while depriving Nikoonahad of

6    said intellectual property and the benefits of the contract.

7         12.     When it became apparent to Nikoonahad that RTEC was not making reasonable

8    efforts to develop products pursuant to the Agreement or to use his consulting services for that

9    purpose, Nikoonahad notified RTEC there was a dispute and pursuant to the Agreement he

10    requested that RTEC engage with him in dispute resolution. RTEC refused to participate in the

11    dispute resolution process as provided for in the Agreement.

12         13.     Nikoonahad has sustained a monetary loss and harm due to RTEC' breach of the

13    Agreement the amount of which is not known but which exceeds the amount required to

14    establish the general jurisdiction of the Court and for which Nikoonahad claims damages

15    according to the proof thereof at trial.

16

17                 **SECOND CAUSE OF ACTION**
            **(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

18         14.     Plaintiff incorporates by reference into this cause of action the allegations

19    contained in paragraphs 1-13 of this complaint.

20         15.     The parties entered into the Agreement with the express intention and for the

21    purpose of developing products incorporating the licensed technology that would benefit RTEC

22    by generating product revenue and benefit Nikoonahad by generating royalty revenue. In

23    addition to the express terms of the Agreement, there was an implied covenant of good faith and

24    fair dealing that required each party to use his/its best efforts to perform the Agreement to

25    accomplish said purpose for their mutual benefit

26         16.     RTEC breached the implied covenant of good faith and fair dealing in the

27    Agreement in that, among other things, RTEC acted arbitrarily, unreasonably, or capriciously

28    with regard to developing products using Nikoonahad's intellectual property and/or the licensed

COMPLAINT
Case No.

technology, with regard to prosecuting the patent application, by refusing to honor its agreement to participate in dispute resolution, and by retaining control over Nikoonahad's intellectual property after terminating the license to prevent Nikoonahad from realizing the full benefit of the Agreement.

17.    In doing the things herein alleged, RTEC acted in bad faith and/or with ill will toward Nikoonahad to deprive Nikoonahad of the benefits of the contract. Nikoonahad is informed and believes and thereon alleges that instead of developing products incorporating the licensed technology, RTEC used its control of the development process and Nikoonahad's services to retard and/or avoid the use of the licensed technology.

18.    Nikoonahad has sustained a monetary loss and harm due to RTEC' breach of the covenant of good faith and fair dealing implied as part of the Agreement the amount of which is not known but which exceeds the amount required to establish the general jurisdiction of the Court and for which Nikoonahad claims damages according to the proof thereof at trial.

**THIRD CAUSE OF ACTION**
**(Breach of Fiduciary Duty)**

19.    Plaintiff incorporates by reference paragraphs 1-13 of the First Cause of Action and paragraphs 16-18 of the Second Cause of Action of this complaint.

20.    Pursuant to the exclusive license in the Agreement and in implementation of the Agreement RTEC took control over and responsibility for the intellectual property identified in Exhibit A of the Agreement, but Nikoonahad retained ownership of said intellectual property.

21.    On or about December 19, 2006 RTEC, acting through its agents and attorneys, assumed responsibility for the provisional patent application listed in Exhibit A of the Agreement that was part of Nikoonahad's intellectual property to which the Agreement applied and, as requested by RTEC, Nikoonahad executed a power of attorney to RTEC's agents and attorneys with respect to said patent application.

22.    In taking control of Nikoonahad's intellectual property and through the use of a power of attorney concerning Nikoonahad's patent application, RTEC owed a fiduciary duty to Nikoonahad with respect to his intellectual property, including but not limited to a fiduciary

1   duty diligently to prosecute the patent application, to inform Nikoonahad on a timely basis of

2   matters and issues pertaining to the prosecution of the patent application, and to solicit and

3   utilize Nikoonahad's expertise to secure issuance of the patent.

4       23.     RTEC breached its fiduciary duty to Nikoonahad in that, among other things,

5   RTEC failed to communicate with Nikoonahad regarding matters and issues pertaining to the

6   prosecution of the patent application; RTEC failed to solicit or utilize Nikoonahad's expertise

7   in connection with prosecuting the patent; RTEC failed to notify Nikoonahad that the U.S.

8   Patent and Trademark Office issued an Office Action Summary dated January 14, 2008

9   reflecting a non-final rejection of the patent application; RTEC failed to take any action to

10  provide additional information to the patent examiner to support the patent application or to

11  solicit such information from Nikoonahad; and RTEC retained possession of and control over

12  Nikoonahad's intellectual property thereby depriving Nikoonahad of the ability and opportunity

13  of responding to the rejection of his patent application.

14      24.     Nikoonahad has sustained a monetary loss and harm due to RTEC's breach of

15  fiduciary duty the amount of which is not yet known but which exceeds the amount required to

16  establish the general jurisdiction of the Court and for which Nikoonahad claims damages

17  according to the proof thereof at trial.

18      25.     In doing the things herein alleged, RTEC acted with fraud, malice or oppression,

19  by reason of which exemplary damages should be assessed according to the proof thereof at

20  trial.

21
22                          **FOURTH CAUSE OF ACTION**
                                **(Promissory Fraud)**

23      26.     Plaintiff incorporates by reference paragraphs 1-13 of the First Cause of Action,

24  paragraphs 16-18 of the Second Cause of Action, and paragraphs 20 – 25 of the Third Cause of

25  Action of this complaint.

26      27.     Nikoonahad is informed or believes and thereupon alleges that at the time RTEC

27  entered into the Agreement, it had no intention of performing the Agreement.

28      28.     Instead, RTEC entered into the Agreement to gain access to Nikoonahad's

1   technology and the information he alone could provide concerning its application and use so

2   that RTEC could first pursue the development of products that would allow it to avoid paying

3   any royalties to Nikoonahad as required by the Agreement, while precluding Nikoonahad from

4   collaborating with otherwise granting potential competitors access to the technology.

5       29.    Nikoonahad did not know RTEC's true intentions and he entered into the

6   Agreement in reliance on RTEC's promises that it would develop products using his

7   technology.

8       30.    If Nikoonahad had known RTEC' true intentions, he would not have entered into

9   the Agreement.

10      31.    Nikoonahad justifiably relied to his detriment on the representations of RTEC

11  that it intended to perform the Agreement according to its terms.

12      32.    Nikoonahad has been damaged by RTEC's fraud in an amount not yet known but

13  which exceeds the jurisdictional limitations of the Court for which he claims damages according

14  to the proof thereof at trial.

15      33.    In doing the things herein alleged, RTEC acted with fraud, malice or oppression,

16  by reason of which exemplary damages should be assessed according to the proof thereof at

17  trial.

18                              **PRAYER**

19  Wherefore, Plaintiff prays as follows:

20      1.     For judgment in his favor in an amount in excess of the jurisdictional limitations

21             of the Court, plus interest at the legal rate;

22      2.     For an assessment of punitive damages;

23      3.     For costs of suit; and

24      4.     For such other and further relief as the Court deems proper.

    DATED: March 21, 2008              KORDA, JOHNSON & WALL, LLP

25

26

27              _Ardell Johnson_

                ARDELL JOHNSON

28              Attorney for Plaintiff MEHRDAD NIKOONAHAD

# EXCLUSIVE PATENT LICENSE AND ASSIGNMENT AGREEMENT

THIS AGREEMENT, made effective on the _12TH_ day of _SEPTEMBER_ 2006, by and between **Mehrdad Nikoonahad, Ph.D.** (hereinafter "Licensor"), an individual and citizen of the United States of America residing at 271 Oakhurst Place, Menlo Park, California, 94025, and **Rudolph Technologies, Inc.** (hereinafter "Licensee"), a corporation organized and existing under the laws of the State of Delaware and having its headquarters at One Rudolph Road, Box 1000, Flanders, New Jersey 07836.

WHEREAS, Licensor is the owner of various patents issued, and applications for patents pending, in various countries of the world, and holds certain technical knowledge and know-how as to the implementation and application of the technology described in the aforementioned patents and patent applications; and,

WHEREAS, Licensee desires to acquire licenses to and/or exclusive ownership of certain of the patents, patent applications, technical knowledge and know-how of the Licensor as hereinafter provided;

THEREFORE, in consideration of the foregoing premises, and their respective covenants, undertakings and agreements contained herein, the Parties hereto agree to be bound as follows:

1. **Definitions**

    1.1. "IP Rights" shall mean Licensor's patents and patent applications filed in any jurisdiction, and any corresponding patents and patent applications filed in the same or another jurisdiction(s) as specifically listed in Exhibit A attached hereto and hereby incorporated into this Agreement by reference, and all the United States and foreign patents issuing from such patent applications including all continuations, divisions, reissues, reexaminations and temporal extensions of any of the foregoing. The IP Rights are drawn to technologies for optical critical dimension ("OCD") metrology and line-width roughness metrology, including, but not limited to multi-azimuth scatterometry techniques and apparatus.

    1.2. "Process(es)" shall mean any method or process operating according to the method covered by one or more claims of the IP Rights.

    1.3. "Product(s)" shall mean any and all products covered by one or more claims of the IP Rights.

    1.4. "Licensed Subject Matter" means:

        1.4.1. inventions, discoveries, Products and Processes covered by IP Rights; and,

*EXHIBIT A*

    1.4.2.  unpatented inventions, discoveries and technical information relating to OCD metrology and line-width roughness metrology, including, but not limited to multi-azimuth scatterometry techniques and apparatus that are not at present listed as IP Rights in Exhibit A of this Agreement but which may be added to Exhibit A at a later date; and,

    1.4.3.  know-how, processes, procedures, compositions, devices, methods, formulas, protocols, techniques, software, designs, drawings or data created by the Licensor or Licensor's employees or agents during the term of this Agreement which are not specifically covered by one or more claims of the IP Rights but which are necessary for practicing the technology that is covered by one or more claims of the IP Rights or the unpatented inventions and discoveries and technical information referenced in paragraph 1.4.2.

1.5.  "Excluded Subject Matter" shall mean any inventions, pending patent applications or issued patents, filed in any jurisdiction, that are not listed in Exhibit A except as provided in paragraphs 1.1 and 1.4. Specifically, without limiting the foregoing, the technology described in U.S. provisional patent applications 60/809,650 & 60/811,051 (both relating to optical overlay measurement with non-scatterometry approaches) and any and all improvements, including non-provisional applications, continuations, divisionals, and foreign patents are excluded from this Agreement.

    1.5.1.  Excluded Subject Matter may in some instances relate in some way to the applications or methodologies specifically defined in paragraphs 1.1 and 1.4. In these instances, the Parties shall confer to determine whether a given invention or information is to be categorized as an included IP Right/Licensed Subject Matter or as Excluded Subject Matter.

1.6.  "Gross Sales" shall mean the total amounts invoiced to purchasers during the accounting period in question for Products or Processes sold, shipped, or otherwise transferred by Licensee. Gross Sales also includes all revenues realized from leasing of Products embodying the Licensed Subject Matter, revenues obtained by sub-licensing the IP Rights and/or Licensed Subject Matter, improvements or upgrades made to Products embodying the Licensed Subject Matter, and business partnerships in which the IP Rights are used to generate revenues. Gross Sales exclude third-party data analysis products, shipping costs, taxes or tariffs, and any recovery of damages for infringement of the IP Rights.

1.7.  "Patent Family" shall mean all patents, foreign and domestic, of any type including, but not limited to issued patents and applications that teach substantially the same subject matter as was originally disclosed to Licensee by Licensor, the disclosure being of any form, including, but not limited to an invention disclosure or a provisional patent application.

1.8.  "Royalty Period" shall mean that period of time during which a specific IP Right gives rise to a duty to pay royalties.

2.  **Initial Development License**

2.1.  Subject to the terms and conditions of this Agreement and in exchange for the fee set forth in paragraph 5.1.1 hereinbelow, Licensor hereby grants to Licensee the exclusive, nontransferable, non sub-licensable right and license to develop, test, manufacture, have manufactured for Licensee, use, sell, or offer for sale the Licensed Subject Matter (the "Development License") for a period of eighteen (18) months from the effective date of this Agreement.

3.  **Option to Purchase**

3.1.  Further subject to the terms and conditions of this Agreement and also in exchange for the fee set forth in paragraph 5.1.1 hereinbelow, Licensor hereby grants Licensee for a period of eighteen (18) months from the effective date of this Agreement the option to acquire the Licensed Subject Matter (the "First Option") now existing and existing at the time of exercise of the First Option, for a fee of Six Hundred Thousand U.S. Dollars ($600,000.00) to be paid in the manner described in paragraph 5.2 and its subparagraphs. Furthermore:

3.1.1.  Upon execution of the First Option by Licensee, all rights, title and interest in the Licensed Subject Matter, including the IP Rights (which may include, but are not limited to, the right to enforce the IP Rights and recover for past, present and future damages due to infringement) and technical knowledge and know-how required to practice the Licensed Subject Matter shall be conveyed by Licensor to Licensee.

3.1.2.  Licensor shall take all steps reasonably necessary to ensure that the Licensed Subject Matter, including the IP Rights, are conveyed to Licensee within ten (10) days of the exercise of the First Option by the Licensee, including but not limited to execution of appropriate patent assignments in the form attached hereto as Exhibit D.

3.2.  The First Option is exclusive and non-assignable and exists solely for the benefit of the Parties above. Should Licensee attempt to assign, convey, delegate, or transfer this First Option without the Licensor's express written permission, any such attempt shall be deemed null and void. Similarly, should Licensor attempt to assign, convey, delegate, or transfer any rights in or to the Licensed Subject Matter without the Licensee's express written permission, any such attempt shall be deemed null and void.

3.3.  The First Option may be exercised at any time during its term by written notice from Licensee to Licensor dated before the expiration of the term of the First Option in the fashion set forth in section 15 of this Agreement.

3.4.  Upon exercise of the First Option by the Licensee and payment of the First Option fee as set forth in paragraph 5.2 and its subparagraphs, Licensor shall be obligated to provide certain Ongoing Development Assistance as described in section 4.

4.  **Ongoing Development Assistance**

  4.1.  *Technical Assistance*

  4.1.1.  Licensee agrees to provide consulting services to Licensee over the twelve (12) month period following the effective date of this Agreement on at least the following topics:

  4.1.1.1.  Development of multi-azimuth, multi-angle scatterometry for incorporation into Licensee's next-generation OCD metrology products;

  4.1.1.2.  Market research to identify key applications and points of differentiation for multi-angle, multi-azimuth OCD products;

  4.1.1.3.  Accompanying Licensee sales and marketing personnel for customer visits to promote current and next-generation OCD products and technologies; and,

  4.1.1.4.  Lead efforts to set-up an algorithm development team (possibly offshore) for OCD modeling for the benefit of Licensee.

  4.1.2.  During the period set forth in paragraph 4.1.1, Licensor agrees to perform up to Five Hundred Twenty (520) hours of consulting services. Licensor shall be paid for consulting services at a rate of Two Hundred Twenty Five U.S. Dollars ($225.00) per hour, payable bi-weekly.

  4.1.3.  For consulting services provided beyond the agreed upon Five Hundred Twenty (520) hours, Licensor shall provide to Licensee invoice(s) for services rendered at a rate of Two Hundred Twenty Five U.S. Dollars ($225.00) per hour. In addition to paying the aforementioned invoices on it's already established accounts payable procedures, Licensor shall be issued an IRS Form 1099 for these payments. The performance of consulting services under this paragraph are at the sole discretion of the Licensor.

  4.1.4.  Additionally, the Licensee shall pay any and all expenses incurred by the Licensor in fulfilling his obligations relating to Technical Assistance.

  4.2.  *Inventions and Patent Prosecution*

  4.2.1.  Licensor agrees to disclose to Licensee all of his inventions that are reasonably related to the Licensed Subject Matter and/or the technical

information or know-how necessary to the practice of the inventions that have been conceived by the Licensor, his employees, or agents during the term of this Agreement.

4.2.2. Inventions conceived of by Licensor during the term of this Agreement shall be memorialized as provisional patent applications that are to be filed within ninety (90) days of the conception of the underlying invention. During the term of this Agreement, Licensor shall provide a copy of such provisional patent application(s) to the Licensee within ten (10) days of its filing.

4.2.3. Licensor hereby grants to Licensee an option (the "Second Option") to add any inventions covered by provisional patent application(s) filed pursuant to paragraph 4.2.2, including all United States and foreign patents issuing from such provisional patent application(s) including all continuations, divisions, reissues, reexaminations and temporal extensions of any of the foregoing, to the IP Rights listed in Exhibit A hereto. This Second Option shall apply anew to each successive invention conceived by Licensor during the term of this Agreement.

    *4.2.3.1.* The term of the Second Option granted in paragraph 4.2.3 shall be nine (9) months from the day on which the invention is actually disclosed to Licensee, preferably in the form of the receipt of a copy of a provisional patent application covered by paragraph 4.2.1.

    4.2.3.2. The Second Option is exclusive and non-assignable and exists solely for the benefit of the Parties above. Should Licensee attempt to assign, convey, delegate, or transfer this Second Option without the Licensor's express written permission, any such attempt shall be deemed null and void. Similarly, should Licensor attempt to assign, convey, delegate, or transfer any rights in or to the Licensed Subject Matter without the Licensee's express written permission, any such attempt shall be deemed null and void.

4.2.4. Upon receipt of a copy of a provisional patent application from the Licensor as provided in paragraph 4.2.1, Licensee shall review the subject matter thereof and Licensor shall assist Licensee as needed to enable Licensee's review of the subject matter of the provisional patent application.

4.2.5. Exercise of the Second Option shall be at the sole discretion of the Licensee. Fees due for the exercise of the Second Option are controlled by paragraph 5.3 below.

4.2.6. All right, title and interest in and to IP Rights and to all inventions and discoveries, as well as unpatented inventions and discoveries and technical

information, know-how, processes, procedures, compositions, devices, methods, formulas, protocols, techniques, software, designs, drawings or data that are the subject of the exercise of the Second Option and as documented by a provisional patent application as described in paragraph 4.2.2, including the right to recover damages for past, present and future damages, and any appurtenant technical knowledge or know-how necessary to practice the inventions covered thereby, shall be conveyed by Licensor to Licensee within ten (10) days of the date on which Licensee transmits notice to the Licensor of its exercise of the Second Option. An Assignment having an appropriate form is attached hereto as Exhibit D.

4.2.7. Patent applications covering the IP Rights and/or inventions covered by the Second Option will be prepared and filed at the expense of the Licensee.

4.2.7.1. Licensor shall reasonably assist Licensee in preparing, filing and prosecuting patent applications of any type and filed in any jurisdiction on IP Rights added to Exhibit A of this Agreement.

4.2.8. Inventions made solely by Licensor and inventions made jointly by the Licensor and Licensee shall be subject to this paragraph 4.2. Inventions made solely by the Licensee shall not be subject to this paragraph 4.2.

4.2.9. Licensee agrees that in the event that Licensee does not exercise its Second Option with respect to an invention submitted to Licensee by Licensor pursuant to paragraph 4.2.4, Licensee shall treat all information concerning the aforementioned invention as confidential material as required by the Confidentiality Agreement executed herewith and attached hereto as Exhibit E.

## 5. Royalties

### 5.1. *Development License Fee*

5.1.1. For the grant of the Development License described in paragraph 2.1 of this Agreement, Licensee shall pay to Licensor a one-time fee of One Hundred Thousand U.S. Dollars ($100,000.00) payable on the following schedule:

5.1.1.1. Upon execution of this Agreement, Licensee shall place into an escrow account Fifty Thousand U.S. Dollars ($50,000.00) pending the outcome of a review of the IP Rights by Licensee. The Licensee shall complete this review within six (6) weeks from the effective date of this Agreement.

5.1.1.1.1. If it should appear, as a result of the aforementioned review, that the IP Rights are unenforceable or unpatentable or that the Licensed Subject Matter infringes the intellectual property

rights of a third party, the amount held in escrow shall be returned to Licensee and the Agreement may be terminated. Licensor shall provide all reasonable assistance to Licensee in performing the review of the IP Rights and in the event of the termination of the Agreement under this subsection the Licensor will be paid for his time at the consulting rate as set forth in section 4. Furthermore, in the event that the Agreement is terminated the Licensee agrees not to use any of the Licensor's technology and any improvements thereon for its own products or patents, nor shall the Licensee disclose the technology to any third parties.

5.1.1.1.2.   Where the review of the IP Rights results in a satisfactory assessment, within one (1) week and no later than seven (7) weeks from the date of this Agreement, the Licensee shall release from escrow the Fifty Thousand U.S. Dollars ($50,000.00) placed there for the benefit of the Licensor.

5.1.2.   Within three (3) months of execution of this Agreement, and provided that the review of the IP Rights referenced in paragraph 5.1.1.1 of this Agreement is to the satisfaction of the Licensee, the remaining balance of the fee set forth in paragraph 5.1.1, Fifty Thousand Dollars ($50,000.00), shall be paid directly to Licensor.

5.2.   *First Option Fee*

5.2.1.   As indicated in paragraph 3.1 of this Agreement, upon exercise of the First Option, Licensee shall pay to Licensor a one time fee of Six Hundred Thousand U.S. Dollars ($600,000.00) to purchase the IP Rights. Licensee shall not issue an IRS Form 1099 for this payment. The First Option fee shall be paid as follows:

5.2.1.1.   Three Hundred Thousand U.S. Dollars ($300,000.00) shall be paid to Licensor upon execution of the First Option.

5.2.1.2.   If at the time of the exercise of the First Option a U.S. patent has been issued from U.S. patent application number 60/641,979, then the additional Three Hundred Thousand U.S. Dollars ($300,000.00) will be paid together with monies specified in paragraph 5.2.1.1.

5.2.1.3.   If at the time of the exercise of the First Option no U.S. patent has been issued from U.S. patent application number 60/641,979, the balance of the monies due to Licensor, Three Hundred Thousand U.S. Dollars ($300,000.00), shall be placed in escrow for the Licensor's benefit pending the issuance of a patent based on U.S. patent application number 60/641,979.

5.2.1.3.1. If the patent has not issued within forty-eight (48) months of the effective date of the Agreement, the monies referenced in paragraph 5.2.1.3 will be returned to Licensee. But, if and when the patent issues, Licensor hereby grants Licensee an option for ninety (90) days to purchase the patent under the original Three Hundred Thousand U.S. Dollars ($300,000.00).

5.3. *License Fees*

5.3.1. Royalties shall accrue when Products and/or Processes with respect to which royalty payments as set forth in Exhibit B are required by this Agreement are first shipped, or otherwise transferred pursuant to a sale of the Products and/or Processes.

5.3.2. The term during which Licensee shall pay royalties to Licensor as required under paragraph 5.3.1 above is set forth in paragraph 7.2 hereinbelow.

5.3.3. Commercialization of IP Rights

5.3.3.1. Regarding those IP Rights listed in Exhibit A as of the effective date of this Agreement, no time limit with respect to commercialization of the IP Rights shall apply.

5.3.3.2. Commercialization of IP Rights Added After the Effective Date:

5.3.3.2.1. Where Licensee exercises its Second Option to add an invention(s) to the IP Rights and Products that incorporate the invention are shipped within twenty four (24) months of the date on which the Licensor provided a copy of a provisional patent application on the invention(s) in question, royalties shall be paid by the Licensee to Licensor on such Products as set forth in Exhibit B.

5.3.3.2.2. Where Licensee exercises its Second Option to add an invention(s) to the IP Rights and Products that incorporate the invention are NOT shipped within twenty four (24) months of the date on which the copy of a provisional patent application on the invention(s) in question, Licensee shall pay to Licensor a one-time fee as set forth in Exhibit C except as indicated hereinbelow:

5.3.3.2.2.1. Where a one-time fee as set forth in Exhibit C would otherwise become due, Licensee may elect to pay said fee on a quarterly basis at a rate not lower than one-quarter the total amount due per quarter, provided that payment of said quarterly payment commences at least six (6) months prior to the end of the twenty four (24) period set forth in paragraph 5.3.3.2.1 above.

5.3.3.2.3. All monies paid to Licensor by Licensee under paragraph 5.3.3.2 and its sub-paragraphs as a result of the Licensee's failure to commercialize the an invention within the twenty four (24) period set forth in paragraph 5.3.3.2.1 above shall be credited against any royalties that may come due under paragraph 5.3.1 with respect to only that invention that gave rise to the Licensee's obligation to pay monies under paragraph 5.3.3.2.

## 6. Confidentiality

6.1. In order to assure that all information shared by the Parties remains confidential, Licensor and Licensee shall execute the Confidentiality Agreement attached hereto as Exhibit E.

## 7. Term of Agreement, Royalty Period, Early Termination, and Assignability

7.1. The terms of the Development License and the First Option shall run concurrently, shall begin as of the effective date of this Agreement and shall terminate eighteen (18) months from the effective date of this Agreement.

7.2. The measurement of the Royalty Period is specific to each individual Patent Family listed in the IP Rights inventory of Exhibit A. The Royalty Period is measured from the earliest date on which Products or Processes covered by one or more claims of a given IP Right or IP Rights in a given Patent Family were first sold, shipped or otherwise transferred.

7.2.1. Upon exercise of the First Option, royalties under paragraph 5.3.1 of this Agreement shall become due to Licensor when Licensee first ships or otherwise transfers Products or Processes pursuant to a sale of same that are covered by one or more claims of the IP Rights listed in Exhibit A as of the effective date of the Agreement. The duty to pay said royalties with respect to the aforementioned IP Rights shall continue for a Royalty Period of eight (8) years from the effective date of this Agreement.

7.2.2. Subsequent to the effective date of this Agreement and upon exercise of the Second Option to add an invention(s) to the IP Rights listed in Exhibit A, as provided in section 4.2.3 the duty to pay royalties under paragraph 5.3.1 with respect to the subsequently added IP Rights shall extend for a Royalty Period of eight (8) years measured from the date on which a Product or Process was first shipped or otherwise transferred.

7.3. The term of this Agreement shall end upon expiration of the last Royalty Period.

7.3.1. The Royalty Period for any given Patent Family may not be extended beyond its eight (8) year period, though it is understood that the term of this Agreement may be extended by the addition of a new Patent Family to

the IP Rights such that the eight (8) year Royalty Period attached to the newly-added Patent Family extends beyond the Royalty Period of older Patent Family(ies).

7.4.  Either Party shall have the right to terminate this Agreement without judicial resolution upon written notice to the other after a material breach of any provision by the other Party has gone uncorrected for ninety (90) days after the other Party has been notified in writing of such breach.

7.5.  The Parties may elect to terminate this Agreement at any time provided that both Parties assent to the termination of the Agreement in writing.

7.6.  The rights or privileges provided for in this Agreement may be assigned or transferred by either Party only with the prior written consent of the other Party and with the authorization or approval of any governmental authority as then may be required, except to a successor in ownership of all or substantially all of the assets of the assigning Party, but such successor, before such assignment or transfer is effective, shall expressly assume in writing to the other Party the performance of all of the terms and conditions of the assigning Party.

## 8.  Records and Reports

8.1.  Licensee shall provide quarterly reports indicating the number of Products and/or Processes shipped or otherwise transferred pursuant to a sale that are covered by one or more claims of the IP Rights, along with the Gross Sales price of said Products and/or Processes and the Patent Family of the IP Rights. The aforementioned reports will be transmitted to Licensor within thirty (30) days of the end of the preceding quarter. If during a quarter there are no sales, Licensee shall provide a quarterly report stating clearly that no sales have been made during the quarter in question.

8.1.1.  The quarters of a calendar year end on the following dates: March 31st, June 30th, September 30th, and December 31st.

8.2.  Licensee shall pay all accrued royalties on a quarterly basis within thirty (30) days of the end of the preceding quarter.

8.3.  Licensee agrees to keep adequate and sufficiently detailed records of Licensee's utilization of the Licensed Subject Matter to enable royalties payable hereunder to be determined and to provide such records for inspection by authorized representatives of Licensor at any time upon reasonable advance notice during the regular business hours of Licensee. Such inspection shall take place, if at all, on a quarterly basis. Licensee agrees that any additional records of Licensee, as Licensor may reasonably determine are necessary to verify the above records, shall also be provided to Licensor or his authorized representatives for inspection.

8.4. Where inspection of Licensee's records by an independent auditor/accountant relating to royalties payable under this Agreement reveals a discrepancy in Gross Sales applicable to the calculation of royalties payable under this Agreement of greater than or equal to two percent (2%) for that quarter, Licensee shall pay the balance within ten (10) days plus the fees for the auditor/accountant and all the associated expenses.

8.5. All one-time fees payable under this Agreement shall be accounted for by Licensee separate from any ongoing consulting fees paid to Licensor. This provision shall apply even where one-time fees are payable over an extended time frame.

## 9. Infringement by Third Parties

9.1. Licensee and Licensor shall give notice to one another of any discovered third party infringement of the rights granted herein of which either Party has actual knowledge.

9.2. In any infringement suit or dispute with a third party, the Parties to this Agreement agree to reasonably cooperate fully with each other. At the request and expense of the Party bringing suit, the other Party will permit reasonable access to all relevant personnel, records, papers, information, samples, specimens, etc., during regular business hours.

## 10. Abatement of Royalties and Costs

10.1. Where no Products or Processes sold by the Licensee are covered by any claims of the IP Rights, no royalties will be due to the Licensor under paragraph 5.3 of this Agreement.

10.2. Where Licensee reasonably believes that, the IP Rights are unenforceable against third party infringers, for any reason, and where such belief is substantiated by independent outside patent counsel appointed by Licensor at Licensee's expense, the royalty amounts referenced in paragraph 5.3 will be reduced by fifty percent (50%).

10.3. If, by order of a court, Licensee is required to acquire or license third party patents or intellectual property rights in order to practice the Licensed Subject Matter, the royalty amounts referenced in paragraph 5.3 will be reduced by fifty percent (50%).

10.4. If, by order of a court, Licensee is required to cease and desist practicing the Licensed Subject Matter, for any reason, all royalty payment due to Licensor shall be suspended as of the date of the cease and desist order or injunction pending final adjudication of the reasons leading to the cease and desist order. Where said order or injunction should become final, no royalties shall be paid for the time subsequent to the issuance of the order or injunction.

10.5. Where suit is filed against Licensee by a third party as a result of Licensee's practice of the Licensed Subject Matter, Licensee shall reduce the amount of royalties payable under paragraph 5.3 of this Agreement by fifty percent (50%). The balance of all royalties otherwise owed under paragraph 5.3 of this Agreement shall be placed in escrow for the benefit of the Licensor pending the outcome of the suit. Monies held in escrow for the Licensor shall be handled as follows:

10.5.1. Where the suit filed against Licensee by a third party as a result of Licensee's practice of the Licensed Subject Matter results in the IP Rights being cancelled, terminated, or otherwise declared unenforceable by a court of law, upon the outcome of the suit becoming final, all monies held in escrow for Licensor shall revert to Licensee.

10.5.2. Where the suit filed against Licensee by a third party as a result of Licensee's practice of the Licensed Subject Matter results in an order of the court or a settlement with the third party that requires Licensee to acquire or license third party patents or intellectual property rights, upon the outcome of the suit becoming final, all monies held in escrow for Licensor shall revert to Licensee.

10.5.3. Where the suit filed against Licensee by a third party as a result of Licensee's practice of the Licensed Subject Matter results in an order of the court or a settlement with the third party that requires the Licensee to cease and desist practicing the Licensed Subject Matter, upon the outcome of the suit becoming final, all monies held in escrow for Licensor shall revert to Licensee.

10.5.4. Where the suit filed against Licensee by a third party as a result of Licensee's practice of the Licensed Subject Matter results in a vindication of the IP Rights (subject to the provisions of paragraph 10.2) and the Licensee's continued ability to practice the Licensed Subject Matter, upon the outcome of the suit becoming final, all monies held in escrow for Licensor shall be released to Licensor.

10.6. Recognizing that Licensor has an interest in the outcome of any suit brought against Licensee as a result of Licensee's practice of the Licensed Subject Matter, Licensee hereby agrees to involve Licensor in any defense of the Licensed Subject Matter from suit by a third party or assertion of the IP Rights against a third party. Involvement as used above may include, by way of example only, the development of strategy and tactics relating to a suit, the review of technical materials with legal counsel, the provision of expert opinions, and the like.

11. **Representations and Warranties**

11.1. Licensor represents and warrants that Exhibit A contains a complete and accurate listing of all IP Rights, licensed hereunder and that Licensor has the right to grant the rights, licenses, privileges, and options to purchase granted herein.

11.2. Licensor represents and warrants that as of the effective date of this Agreement Licensor has no knowledge of any claims of infringement filed against Licensor for practicing the Licensed Subject Matter anywhere in the world.

11.3. Except as set forth hereinabove, Licensor makes NO REPRESENTATIONS OR WARRANTIES, express or implied, with regard to the infringement of proprietary rights of any third party.

11.4. Licensee acknowledges that the export of any of the Licensed Subject Matter from the United States or the disclosure of any of the Licensed Subject Matter to a foreign national may require some form of license from the U.S. Government. Failure to obtain any required export licenses by Licensee may result in Licensee subjecting itself to criminal liability under U.S. laws.

## 12. **Disclaimers**

12.1. To the extent permitted by law, neither party nor persons acting on their behalf will be responsible for any injury to or death of persons or other living things or damage to or destruction of property or for any other loss, damage, or injury of any kind whatsoever resulting from the other Party's provision or manufacture, use, or sale of materials, information, or Licensed Subject Matter or use of the Process or Products hereunder.

12.2. EXCEPT AS SET FORTH HEREINABOVE, NEITHER PARTY, NOR PERSONS ACTING ON THEIR BEHALF MAKE ANY WARRANTY, EXPRESS OR IMPLIED: (1) WITH RESPECT TO THE MERCHANTABILITY, ACCURACY, COMPLETENESS, OR USEFULNESS OF ANY SERVICES, MATERIALS, OR INFORMATION FURNISHED HEREUNDER; (2) THAT THE USE OF ANY SUCH SERVICES, MATERIALS, OR INFORMATION WILL NOT INFRINGE PRIVATELY OWNED RIGHTS; (3) THAT THE SERVICES, MATERIALS, OR INFORMATION FURNISHED HEREUNDER WILL NOT RESULT IN INJURY OR DAMAGE WHEN USED FOR ANY PURPOSE; OR (4) THAT THE SERVICES, MATERIALS, OR INFORMATION FURNISHED HEREUNDER WILL ACCOMPLISH THE INTENDED RESULTS OR ARE SAFE FOR ANY PURPOSE, INCLUDING THE INTENDED OR PARTICULAR PURPOSE. FURTHERMORE, THE PARTIES HEREBY SPECIFICALLY DISCLAIM ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, FOR ANY INFORMATION PROVIDED OR PRODUCTS MANUFACTURED, USED, OR SOLD OR PROCESS USED BY EITHER PARTY. NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES IN ANY EVENT.

12.3. In no event shall Licensor be liable under this Agreement in excess of the amount of monies paid by the Licensee under this Agreement.

13. **Rights of Parties After Termination**

13.1. Neither Party shall be relieved of any obligation or liability under this Agreement arising from any act or omission committed prior to the effective date of such termination.

13.2. Upon termination of this Agreement for any reason whatsoever, any royalties that remain unpaid shall be properly reported and paid to Licensor within thirty (30) days of any such termination.

13.3. The rights and remedies granted herein, and any other rights or remedies which the Parties may have, either at law or in equity are cumulative and not exclusive of others.

14. **Force Majeure**

14.1. No failure or omission by Licensor or by Licensee in the performance of any obligation under this Agreement shall be deemed a breach of this Agreement or create any liability if the same shall arise from acts of God, acts or omissions of any government or agency thereof, compliance with rules, regulations, or orders of any governmental authority or any office, department, agency, or instrumentality thereof, fire, storm, flood, earthquake, accident, acts of the public enemy, war, rebellion, insurrection, riot, sabotage, invasion, quarantine, restriction, transportation embargoes, or failures or delays in transportation.

15. **Notices**

15.1. All notices and reports shall be addressed to the Parties hereto as follows:

**If to Licensor:**
Mehrdad Nikoonahad, Ph.D.
271 Oakhurst Place
Menlo Park, CA 94025

Facsimile:
(650) 289-0623

Email: Mehrdad@nikoonahad.com

**If to Licensee:**
Robert Koch
Vice President & General Counsel
One Rudolph Road, Box 1000
Flanders, NJ    07836

Telephone:
(973) 448-4487
Facsimile:
(973) 691-1435

Email:  Robert.koch@rudolphtech.com

15.2. All royalty payments due Licensor shall be sent to: Mehrdad Nikoonahad, 271 Oakhurst Place, Menlo Park, CA 94025 or such address as provided by Licensor from time to time.

15.3. Any notice, report or any other communication required or permitted to be given by one Party to the other Party by this Agreement shall be in writing and either (a) served personally on the other Party, (b) sent by express, registered or certified first-class mail, postage prepaid, addressed to the other Party at its address as indicated above, or to such other address as the addressee shall have previously furnished to the other Party by proper notice, (c) delivered by commercial courier to the other Party, (d) sent by facsimile to the other Party at its facsimile number indicated above or to such other facsimile number as the Party shall have previously furnished to the other Party by proper notice, with machine confirmation of transmission, or by electronic mail (email) to the email addresses given above.

## 16. Waivers

16.1. The failure of either Party at any time to enforce any provisions of this Agreement or to exercise any right or remedy shall not be construed to be a waiver of such provisions or of such rights or remedy or the right of such Party thereafter to enforce each and every provision, right or remedy.

## 17. Modifications

17.1. It is expressly understood and agreed by the Parties hereto that this instrument contains the entire Agreement between the Parties with respect to the subject matter hereof and that all prior representations, warranties, or agreements relating hereto have been merged into this document and are thus superseded in totality by this Agreement. This Agreement may be amended or modified only by a written instrument signed by the duly authorized representatives of both of the Parties.

## 18. Headings

18.1. The headings for the sections set forth in this Agreement are strictly for the convenience of the Parties hereto and shall not be used in any way to restrict the meaning or interpretation of the substantive language of this Agreement.

## 19. Law

19.1. This Agreement shall be construed according to the laws of the State of New Jersey and the United States of America.

## 20. Dispute Resolution

20.1. If a dispute arises out of or relates to this contract, or the breach thereof, and if the dispute cannot be settled through negotiation, the parties agree first to try in

good faith to settle the dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Rules before resorting to arbitration, litigation, or some other dispute resolution procedure.

20.2. Any mediation taking place pursuant to paragraph 20.1 shall take place in San Francisco, California.

## 21. Execution

Rudolph Technologies, Inc. and Mehrdad Nikoonahad, Ph.D. have caused this Agreement to be executed by their duly authorized representatives as of the day first above written. This Agreement has been executed in duplicate, whereby both Rudolph Technologies, Inc. and Mehrdad Nikoonahad, Ph.D. have each retained one copy.

*Signatures to follow on the next page.*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement in duplicate through their duly authorized representatives as of the date first set forth hereinabove.

Rudolph Technologies, Inc.

By: _____

Name: _ROBERT LOITERMAN_

Title: _SENIOR VICE PRESIDENT &_
       _GENERAL MANAGER,_
       _METROLOGY BUSINESS UNIT_

Mehrdad Nikoonahad, Ph.D.

By: _M. Nikoonahad_

Name: _MEHRDAD NIKOONAHAD_

Title: _President, Nikoonahad Consulting_

## Exhibit A

### Proprietary Rights

| ASSET NO. | PATENT NO./ SERIAL NO. | ISSUE DATE/ FILING DATE | TITLE | INVENTORS |
|---|---|---|---|---|
| 1 | US patent number: 6,867,862 | 15 March, 2005 | System and Method for Characterizing Three-Dimensional Structures | Nikoonahad, Mehrdad |
| 2 | US patent Application number: 60/641,979 | 21 December, 2005 | Multi-Channel Optical Metrology | Nikoonahad, Mehrdad |
| 3 | International PCT Publication Number: WO 2004/046655 A3 | 3 June, 2004 | System and Method for Characterizing Three-Dimensional Structures | Nikoonahad, Mehrdad |

### NOTICE

This Exhibit contains financial and commercial information that is BUSINESS CONFIDENTIAL and the Parties hereby agree not to use or disclose this Exhibit to any third Party without the advance written approval of the other Party hereto, except to those necessary to enable the Parties to perform under this Agreement.

Initials:

Licensor: _M. N._

Date: _9/13/06_

Licensee: _R M_

Date: _9/12/06_

## Exhibit B

### Royalties

Royalties for Products or Processes incorporating the Licensed Subject Matter including integrated equipment (integrated in this context shall mean a metrology module that is attached to a process tool such as a track used in the litho section of the fab), (hereinafter "LSM Tools") shall be paid as follows:

- For LSM Tools having a Gross Sales price of under $1,000,000, a royalty of 2.0% of the Gross Sales for these LSM Tools shall be payable quarterly;

- For LSM Tools having a Gross Sales price of $1,000,000 - $1,500,000, a royalty of 2.75% of the Gross Sales for these LSM Tools shall be payable quarterly; and,

- For LSM Tools having a Gross Sales price over $1,500,000, a royalty of 3.5% of the Gross Sales for these LSM Tools shall be payable quarterly.

Royalties for Products or Processes incorporating both the Licensed Subject Matter and additional inspection and metrology functionalities not covered by the Licensed Subject Matter wherein the metrology tool comprises modules arranged in a cluster (hereinafter "Combo Tools") shall be paid as follows:

- For Combo Tools having a Gross Sales price of under $1,250,000, a royalty of 1.25% of the Gross Sales for these Combo Tools shall be payable quarterly;

- For Combo Tools having a Gross Sales price of $1,250,000 - $1,750,000, a royalty of 1.63% of the Gross Sales for these Combo Tools shall be payable quarterly; and,

- For Combo Tools having a Gross Sales price over $1,750,000, a royalty of 2.0% of the Gross Sales for these Combo Tools shall be payable quarterly.

### NOTICE

**This Exhibit contains financial and commercial information that is BUSINESS CONFIDENTIAL and the Parties hereby agree not to use or disclose this Exhibit to any third Party without the advance written approval of the other Party hereto, except to those necessary to enable the Parties to perform under this Agreement.**

Initials:

Licensor: _M. A._

Date: _9/13/06_

Licensee: _RM_

Date: _9/12/06_

Page 19 of 24

**Exhibit C**

**Flat Fee Payments for Un-commercialized Inventions**

One-Time Flat Fee for Un-commercialized Inventions transferred to Licensee by Licensor:    -

One Hundred Thousand U.S. Dollars ($100,000.00)

**NOTICE**

This Exhibit contains financial and commercial information that is BUSINESS CONFIDENTIAL and the Parties hereby agree not to use or disclose this Exhibit to any third Party without the advance written approval of the other Party hereto, except to those necessary to enable the Parties to perform under this Agreement.

Initials:

Licensor: _M·N·_

Date: _9/13/06_

Licensee: _RMV_

Date: _9/12/06_

## Exhibit D

## Form of Assignment

WHEREAS, Mehrdad Nikoonahad, Ph.D., a citizen of the United States of America, residing at 271 Oakhurst Place, Menlo Park, California, as assignor is the owner of the following patent or patent application (additional inventors and assignors shall be attached hereto on a separate sheet as needed):

| Patent No./Serial No. | Issue Date/ Filing Date | Title |
|---|---|---|
| | | |

AND WHEREAS, RUDOLPH TECHNOLOGIES, INC., a Delaware corporation, having a place of business at One Rudolph Road, Flanders, New Jersey, as assignee, is desirous of acquiring all right, title and interest in and to said invention and any Letters Patent, foreign or domestic, that may be granted therefore.

NOW, THEREFORE, in consideration as set forth in an agreement executed by both Parties on _____, hereby incorporated by reference, we as assignor hereby sells, assigns and sets over to said assignee the entire right, title and interest for the United States of America and all other countries in and to said invention and the aforesaid application for Letters Patent, all original, divisional, continuation, substitute or reissue applications and patents applied for or granted therefore in the United States of America and all other countries, and the Commissioner of Patents and Trademarks is hereby authorized and requested to issue all Letters Patent on said invention and all assignments thereof to said assignee herein, as assignee of the entire interest therein; and the undersigned for me and my legal representatives, heirs and assigns do hereby agree and covenant without further remuneration, except as set forth in said corresponding agreement, to execute and deliver all divisional, continuation, reissue and other applications for Letters Patent on said invention and all assignments thereof to said assignee or its assigns, to communicate to said assignee or its representatives all facts reasonably known to the undersigned respecting said invention, whenever requested, to testify in any interferences or other legal proceedings in which any of said applications or patents may become involved, to sign all lawful papers, make all rightful oaths, and to do generally everything reasonably necessary to aid assignee, its successors, assigns and nominees to obtain patent protection for said invention in all countries, the expenses incident to said applications to be borne and paid by said assignee, which expense shall includes assignor's consulting fees for his time at a rate set forth in said agreement.

Date: _____

_____
Mehrdad Nikoonahad, Ph.D.


_____
Witness

Page 21 of 24

**Exhibit E**

## Confidentiality Agreement

Effective Date: <u>September 5, 2006</u>

THIS AGREEMENT, between Rudolph Technologies, Inc. (including its subsidiaries and affiliates, collectively referred to as "RTEC"), and Mehrdad Nikoonahad, Ph.D., ("Dr. Nikoonahad"), is entered into to assure the protection and preservation of certain Confidential Information (as defined below). The parties agree to handle information disclosed hereunder as follows:

1.  <u>Definition</u>: As used in the Agreement, Confidential Information shall be defined as trade secrets of the Discloser (as defined below), and proprietary information and confidential knowledge and information which is indicated as being of a confidential or proprietary nature, including, but not limited to, matters of a technical nature such as materials, discoveries, ideas, patent rights, concepts, designs, drawings, specifications, processes, techniques, models, diagrams, flow charts, research, development, know-how, trade secrets, computer programs and routines, software in various stage's of development, source codes and object codes (including modifications and enhancements), and documentation, whether contained in magnetic media or hard copy or delivered orally.

2.  <u>Disclosing Party</u>: The party(ies) disclosing Confidential Information ("Discloser") are

    (check as appropriate):  ☒ RTEC      ☒ Dr. Nikoonahad

3.  <u>Primary Representative</u>:  Each party's representative for coordinating disclosure or receipt of Confidential Information is:

    RTEC: <u>Christopher Morath</u>      Dr. Nikoonahad: <u>Dr. Nikoonahad</u>

4.  <u>Description of Confidential Information</u>: Confidential Information disclosed under this Agreement is described as:

    RTEC:  <u>Technologies related to optical critical dimension (OCD) metrology and line-width roughness metrology including, but not limited to multi-azimuth scatterometry techniques and apparatus; competitive information such as market analysis, forecasts, and technology roadmap information; and, analytic information such as intellectual property analyses and reports.</u>

    Dr. Nikoonahad:  <u>Technologies for optical critical dimension (OCD) metrology and line-width roughness metrology, including, but not limited to multi-azimuth scatterometry techniques, algorithms and apparatus.</u>

5.  <u>Use of Confidential Information</u>:  The party receiving Confidential Information ("Recipient") shall make use of the Confidential Information only for the following purpose(s) ("Purpose"):

    Purpose: <u>To carry out the purpose and intent of an EXCLUSIVE PATENT LICENSE AND ASSIGNMENT AGREEMENT dated September, 5, 2006 and certain other consulting services as set forth therein.</u>

6.  <u>Recipient Obligations</u>: Recipient agrees: (a) to protect the Confidential Information by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use, dissemination; or publication of the Confidential Information as Recipient uses to protect its own confidential information of a like nature; (b) not to disclose any Confidential Information to any person or entity without the prior written authorization by Discloser except that Recipient is authorized to disclose Confidential Information to employees or approved agents on a need to know basis so long as each employee and approved agent has signed an agreement requiring similar nondisclosure provisions as found herein; (c) not to apply, use, utilize, incorporate or in any way draw upon any Confidential Information for the development or sale of any products or services or creation of any intellectual property; (d) to hold and make use of the Confidential Information only for the benefit of Discloser and consistent with the Purpose of this Agreement; (e) not to reproduce or copy, in whole or in part, any Confidential Information without the written authorization of a Discloser; (f) to maintain security procedures to prevent the loss, disclosure or

Page 22 of 24

commingling of Confidential Information, and shall notify Discloser in writing within ten (10) business days of its discovery of any such loss, disclosure or commingling; (g) not to remove any proprietary, copyright, semiconductor chip protection, trade secret, or other legend from any form of the Confidential Information; and (h) to exercise its best efforts to promptly return or destroy, upon written request, all tangible forms of the Confidential Information.

7. **Exclusions**: This Agreement imposes no obligation upon Recipient with respect to information that: (a) was rightfully in Recipient's possession before receipt from Discloser; (b) is or becomes publicly known through no fault of Recipient; (c) is rightfully received by Recipient from a third party without a duty of confidentiality to Discloser; (d) is disclosed by Discloser to a third party without a duty of confidentiality on the third party; (e) Recipient can demonstrate through tangible evidence was independently developed by Recipient without reference to the Confidential Information; (f) is approved for release by the prior written authorization of Discloser; or (g) is disclosed pursuant to any judicial or governmental request, requirement, or order, provided that Recipient takes reasonable steps to give Discloser sufficient prior notice to contest such request, requirement, or order.

8. **Marking**: Recipient's obligations shall only extend to Confidential Information that is described in paragraph 4, and that: (a) comprises specific materials individually listed in paragraph 4; or (b) is marked as confidential at the time of disclosure; or (c) is unmarked (e.g. orally disclosed) but treated as confidential at the time of disclosure.

9. **Warranty**: Discloser warrants that it has the right to make the disclosures under this Agreement. NO OTHER WARRANTIES ARE MADE BY EITHER PARTY UNDER THIS AGREEMENT. ANY CONFIDENTIAL INFORMATION EXCHANGED HEREUNDER IS PROVIDED "AS IS". Neither party assumes any liability to the other for damages arising from the use of or reliance upon any Confidential Information disclosed under this Agreement.

10. **Rights**: No rights in or licenses to trademarks, inventions, copyrights, ideas, know-how, technology or patents present or future are implied or granted under this Agreement t except the limited rights necessary to carry out the Purpose set forth in paragraph 5. Discloser shall retain title to all tangible forms of the Confidential Information delivered pursuant to this Agreement. This Agreement shall not restrict reassignment of Recipient's employees.

11. **Period & Duration**: The period for exchange of Confidential Information shall run concurrently with the term of the EXCLUSIVE PATENT LICENSE AND ASSIGNMENT AGREEMENT dated September 5, 2006 described above or three (3) years from the Effective Date of this Agreement, whichever is longer. The duration of obligations under this Agreement shall be for five (5) years from the date of the last disclosure by Discloser.

12. **Tax Treatment Exception**: The parties hereto are permitted, and have been permitted since the commencement of discussions, to disclose to any and all persons, without limitations of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analysis) that are or have been provided to such parties related to such tax treatment and structure. However, the tax treatment and tax structure shall be kept confidential to the extent reasonably necessary to comply with any applicable securities laws.

13. **Export Restrictions**: Recipient specifically agrees to comply with the regulations of the United States Department of Commerce relating to the export of technical data in so far as it relates to the information, materials, and data transferred or disclosed to Recipient under this Agreement, and further agrees that neither it nor its employees or customers will export or re-export any confidential or technical information nor any process, products, service that is produced as a result of the use of such information, to any countries specified in such regulations as a prohibited destination, without first obtaining United States government approval by application through Discloser.

14. **Remedies**: Recipient acknowledges and agrees that its obligations hereunder are essential in order to protect Discloser and its business as any violation would cause irreparable harm to the Discloser, and expressly acknowledges and agrees that monetary damages alone would be inadequate to compensate Discloser for any breach of this Agreement. Accordingly, Recipient agrees that, in addition to any other remedies that may be available in law, in equity, or otherwise, Discloser shall be entitled to obtain temporary, preliminary, and/or permanent injunctive relief against the threatened breach of this Agreement,

Page 23 of 24

or the continuation of any such breach without the necessity of proving damage. Nothing stated in this Agreement shall be construed as a waiver by Discloser of its right to pursue any other available remedies, including the recovery of damages from Recipient.

15. Miscellaneous:

a. Failure by Discloser to insist upon strict performance to any term in this Agreement or failure by Discloser to act in the event of any breach or default shall not be construed as a consent or waiver of that breach or default or any subsequent breach or default of the same or any other term of this Agreement.

b. This Agreement:: (i) imposes no obligation on either party to purchase, sell, license, transfer or otherwise dispose of any technology, services or products; (ii) shall not constitute, create or otherwise imply a joint venture, partnership, agency or formal business organization of any kind; (iii) shall be binding upon and will inure to the benefit of the undersigned parties, their successors and assigns; (iv) constitutes the entire Agreement between the parties and supersedes and merges all prior proposals, understandings, discussions and agreements, whether written or oral, between the parties relating to the subject matter hereof, and may be modified and/or amended from time to time only by mutual agreement in writing, executed by both parties; and (v) is made under and shall be construed according to the laws of the State of New Jersey, U.S.A.., exclusive of its conflicts of laws principles. Venue for any disputes arising under this Agreement shall be exclusively and solely in the State of New Jersey, U.S.A., and Company hereby consents to the jurisdiction of said courts.

The terms, conditions and/or provisions contained in this Agreement shall be considered null and void if this Agreement has not been executed by the parties within ninety (90) days from the date written on the first page of this Agreement. Upon execution of this Agreement, the terms, conditions and/or provisions contained within this Agreement shall be valid, binding and in good standing.

Rudolph Technologies, Inc.
One Rudolph Road, P.O. Box 1000
Flanders, New Jersey, U.S.A. 07836

By: _____

Name: Robert A. Koch
Title: Vice President & General Counsel

Dr. Nikoonahad:
Address: 271 Oakhurst Place,
Menlo Park, California, 94025

By: _____

Name: Mehrdad Nikoonahad, Ph.D.

**SUMMONS**
**(CITACION JUDICIAL)**

SUM-100

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

NOTICE TO DEFENDANT:
*(AVISO AL DEMANDADO)* :
Rudolph Technologies, Inc. and Does 1 - 25, inclusive

MAR 21 08

KIRI TORRE
EXEC. OFFICER/CLERK
EROR COURT OF
OF SANTA CLARA

YOU ARE BEING SUED BY PLAINTIFF:
*(LO ESTA DEMANDANDO EL DEMANDANTE)* :
Mehrdad Nikoonahad

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DIAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Santa Clara County Superior Court | CASE NUMBER<br>*(Número del Caso):*<br>**108CV108700** |

191 N First St.
San Jose, CA 95113

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Ardell Johnson
66 E. Santa Clara Street, Suite 250
(408) 494-0700

KORDA, JOHNSON & WALL, LLP
San Jose, CA 95113

| | | | |
|---|---|---|---|
| DATE: **MAR 21 2008**<br>*(Fecha)* | *Kiri Torre*<br>Chief Executive Officer/ Clerk | Clerk, by _____ J. Cao-Nguyen _____<br>*(Secretario)* | , Deputy<br>*(Adjunto)* |

For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
[SEAL]
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)* :

3. ☐ on behalf of *(specify)* :
   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)          ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)     ☐ CCP 416.90 (authorized person)
   ☐ other *(specify)* :
4. ☐ by personal delivery on *(date)* :

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]
Martin Dean's Essential Forms ™

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465

Nikoonahad

JS 44 (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

MEHRDAD NIKOONAHAD

**DEFENDANTS**

RUDOLPH TECHNOLOGIES, INC.

**(b)** County of Residence of First Listed Plaintiff  San Mateo, California
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

E-FILING

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

John W. Clark, SBN 036664
2600 El Camino Real, Suite 410
Palo Alto, CA 94306
(650) 354-3605

Ardell Johnson, SBN 095340
66 East Santa Clara St., # 250
San Jose, CA 95113
(408) 494-0700

Attorneys (If Known)

WILSON SONSINI GOODRICH & ROSATI
Keith E. Eggleton, SBN 159842
Rodney G. Strickland, SBN 161934
Anthony J Weibell, SBN 238850

650 Page Mill Road
Palo Alto, CA 94304
(650) 493-9300

C08 02290 PVT

ADR

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [X] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [X] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury— | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Med. Malpractice | [ ] 625 Drug Related Seizure | 28 USC 157 | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | Liability | [ ] 365 Personal Injury — | of Property 21 USC 881 | | [ ] 450 Commerce |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & | Product Liability | [ ] 630 Liquor Laws | **PROPERTY RIGHTS** | [ ] 460 Deportation |
| & Enforcement of Judgment | Slander | [ ] 368 Asbestos Personal | [ ] 640 R.R. & Truck | [ ] 820 Copyrights | [ ] 470 Racketeer Influenced and |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' | Injury Product | [ ] 650 Airline Regs. | [ ] 830 Patent | Corrupt Organizations |
| [ ] 152 Recovery of Defaulted | Liability | Liability | [ ] 660 Occupational | [ ] 840 Trademark | [ ] 480 Consumer Credit |
| Student Loans | [ ] 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | [ ] 490 Cable/Sat TV |
| (Excl. Veterans) | [ ] 345 Marine Product | [ ] 370 Other Fraud | [ ] 690 Other | | [ ] 810 Selective Service |
| [ ] 153 Recovery of Overpayment | Liability | [ ] 371 Truth in Lending | | | [ ] 850 Securities/Commodities/ |
| of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | Exchange |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle | Property Damage | [ ] 710 Fair Labor Standards | [ ] 861 HIA (1395ff) | [ ] 875 Customer Challenge |
| [X] 190 Other Contract | Product Liability | [ ] 385 Property Damage | Act | [ ] 862 Black Lung (923) | 12 USC 3410 |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal Injury | Product Liability | [ ] 720 Labor/Mgmt. Relations | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| [ ] 196 Franchise | | | [ ] 730 Labor/Mgmt.Reporting | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | [ ] 865 RSI (405(g)) | [ ] 892 Economic Stabilization Act |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motions to Vacate | [ ] 740 Railway Labor Act | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 442 Employment | Sentence | [ ] 790 Other Labor Litigation | **FEDERAL TAX SUITS** | [ ] 894 Energy Allocation Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ | **Habeas Corpus:** | [ ] 791 Empl. Ret. Inc. | [ ] 870 Taxes (U.S. Plaintiff | [ ] 895 Freedom of Information |
| [ ] 240 Torts to Land | Accommodations | [ ] 530 General | Security Act | or Defendant) | Act |
| [ ] 245 Tort Product Liability | [ ] 444 Welfare | [ ] 535 Death Penalty | | [ ] 871 IRS—Third Party | [ ] 900Appeal of Fee |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities - | [ ] 540 Mandamus & Other | **IMMIGRATION** | 26 USC 7609 | Determination |
| | Employment | [ ] 550 Civil Rights | [ ] 462 Naturalization Application | | Under Equal Access |
| | [ ] 446 Amer. w/Disabilities - | [ ] 555 Prison Condition | [ ] 463 Habeas Corpus – | | to Justice |
| | Other | | Alien Detainee | | [ ] 950 Constitutionality of |
| | [ ] 440 Other Civil Rights | | [ ] 465 Other Immigration | | State Statutes |
| | | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- [ ] 1 Original Proceeding
- [X] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 1332

Brief description of cause:
Breach of Contract; Implied Covenant of Good Faith and Fair Dealing; Fiduciary Duty; Promissory Fraud

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
- DEMAND $
- CHECK YES only if demanded in complaint:
- JURY DEMAND: [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

- [ ] SAN FRANCISCO/OAKLAND
- [X] SAN JOSE

DATE
May 2, 2008

SIGNATURE OF ATTORNEY OF RECORD