1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E-Filed 10/27/2010**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| MEHRDAD NIKOONAHAD,<br><br>Plaintiff,<br><br>v.<br><br>RUDOLPH TECHNOLOGIES, INC. and DOES 1-25, inclusive,<br><br>Defendants. | Case Number 5:08-cv-02290 JF (PVT)<br><br>**ORDER[1] GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION TO FILE SUPPLEMENTAL DECLARATION**<br><br>Re: Docket Nos. 111, 124 |

Defendants Rudolph Technologies, et al. ("Rudolph") seek summary judgment on the claim of Plaintiff Mehrdad Nikoonahad for breach of the implied covenant of good faith and fair dealing. Having considered the evidence presented by Nikoonahad and the rational inferences that may be drawn from that evidence, the Court concludes that no reasonable jury could find in favor of Nikoonahad. Accordingly, summary judgment will be granted.

## I. BACKGROUND

Nikoonahad is an electronic engineer who holds several patents relating to semiconductor measurement and wafer inspection. The patents describe a technique known as Optical Critical Dimension ("OCD") measurement. Rudolph designs and produces equipment utilized by semiconductor device manufacturers. It is incorporated under the laws of Delaware and is

---

[1] This disposition is not designated for publication.

headquartered in New Jersey.

On September 12, 2006, Nikoonahad and Rudolph entered into an exclusive patent licensing and assignment agreement ("the Agreement") under which Rudolph paid Nikoonahad $100,000 in two installments to obtain an Initial Development License that gave it the exclusive rights to the licensed technology for eighteen months. ("the License") Agmt. ¶ 2.1. After paying the first installment, Rudolph had six weeks to perform due diligence on the technology. Agmt. ¶ 5.1.1.1. If the review proved unsatisfactory, Rudolph could terminate the Agreement. *Id.* However, if Rudolph was pleased with the results, it would pay the second installment to complete the purchase of the License. Agmt. ¶ 5.1.2. During the eighteen-month period, Rudolph had the option to acquire the licensed technology for a fee of $600,000. ("First Option") Agmt. ¶ 3.1. If Rudolph decided not to exercise this option by the end of the eighteen-month period, the option and the License would terminate. Agmt. ¶ 7.1.

The Agreement required Nikoonahad to disclose to Rudolph "all of his inventions that [were] reasonably related to the Licensed Subject Matter" and to file and inform Rudolph of provisional patent applications for any new inventions. Agmt. ¶ 4.2.1. Nikoonahad also was obligated to grant Rudolph the option to add to the licensed subject matter any new inventions Nikoonahad created during the term of the Agreement. ("Second Option") Agmt. ¶ 4.2.3. Rudolph then would have the right to purchase these inventions. Agmt. ¶ 4.2.3.

The Agreement contained provisions for the payment of royalties and license fees in the event that the options were exercised. Agmt. ¶¶ 5.2, 5.3. Nikoonahad agreed "to perform up to Five Hundred Twenty (520) hours of consulting services" at a specified rate. Agmt. ¶ 4.1.2. The parties agreed that if a dispute relating to the contract arose that could not be settled through negotiation, they would attempt to settle the dispute through mediation before resorting to arbitration or litigation. Agmt. ¶ 20.1. The Agreement was to be construed according to the laws of New Jersey. Agmt. ¶ 19.1.

On December 5, 2007, Rudolph informed Nikoonahad that it would not exercise its option to purchase the licensed technology. SAC ¶ 39, Ex. M. As of that date, Rudolph had not

1
2
3
4
5
6
7
8
9
10
11
12
13

produced any royalty-bearing products.  The eighteen-month term of the Agreement expired on March 12, 2008.  On March 21, 2008, Nikoonahad filed suit against Rudolph in the Santa Clara Superior Court, alleging claims for breach of written contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and promissory fraud.  Following removal to this Court and several rounds of motion practice, this Court dismissed all of Nikoonahad's claims with the exception of a claim for breach of the implied covenant of good faith and fair dealing.  Nikoonahad contends that Rudolph breached the covenant by: (1) exercising its control over Nikoonahad's technology to deprive him of the ability to license, sell, or otherwise commercialize it; (2) exercising control over the development of products in such a way as to ensure that no products requiring payment of royalties were developed before the expiration of the Agreement; and (3) retaining the subject intellectual property for its own benefit after terminating the contract.  SAC ¶¶ 53-55.  Pursuant to Fed. R. Civ. P. 56., Rudolph now moves for summary judgment.  Nikoonahad opposes the motion.

14

## II.  LEGAL STANDARD

15
16
17
18
19
20
21

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  The moving party bears the initial burden of informing the Court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

22
23
24
25
26
27

If the moving party meets this initial burden, the burden shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex,* 477 U.S. at 324.  A genuine issue for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor.  *Anderson,* 477 U.S. 242, 248-49, 106 S.Ct. 2505, 91 L.Ed.2d 202; *Barlow v. Ground,* 943 F.2d 1132, 1134-36 (9th Cir. 1991).

28

3

1  However, "[a] non-movant's bald assertions or a mere scintilla of evidence in his favor are both

2  insufficient to withstand summary judgment."  *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir.

3  2009).

4                                    **III.  DISCUSSION**

5          Pursuant to the Agreement, New Jersey law governs Nikoonahad's claim for breach of

6  the implied covenant of good faith and fair dealing.  In New Jersey, the covenant mandates that

7  "neither party shall do anything which will have the effect of destroying or injuring the right of

8  the other party to receive the fruits of the contract."  *Emerson Radio Corp. V. Orion Sales, Inc.*,

9  253 F.3d 159, 170 (3d Cir. 2001) (quoting *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575,

10 587 (N.J. 1997)).  New Jersey law recognizes three instances in which a party may assert an

11 independent claim for breach of the implied covenant: "(1) when the contract does not provide a

12 term necessary to fulfill the parties' expectations . . . (2) when bad faith served as a pretext for

13 the exercise of a contractual right to terminate . . . [and] (3) when the contract expressly provides

14 a party with discretion regarding its performance."  *Seidenberg v. Summit Bank*, 791 A.2d 1068,

15 1078 (N.J. Super Ct. App. Div. 2002) (citations omitted).  The third instance may manifest "if

16 the discretion-exercising party . . . unilaterally use[s] that authority in a way that intentionally

17 subjects the other party to a risk beyond the normal business risks that the parties could have

18 contemplated at the time of contract formation."  *Id.* (quoting *Wilson v. Amerada Hess Corp.*,

19 773 A.2d 1121 (N.J. 2001)).

20         "Proof of 'bad motive or intention' is vital to an action for breach of the covenant."

21 *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., LLP*, 864 A.2d 387, 396

22 (N.J. 2005).  As the New Jersey Supreme Court noted in *Wilson v. Amerada Hess Corp.*,

23 "[c]ontract law does not require parties to behave altruistically toward each other; it does not

24 proceed on the philosophy that I am my brother's keeper." 773 A.2d 1121, 1131 (N.J. 2001)

25 (citing *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d

26 273, 280 (7th Cir. 1992)).

27         Rudolph contends that summary judgment should be granted on two independent

28

4

grounds:  (1) Nikoonahad has failed to meet his burden of presenting evidence to show that Rudolph acted with ill motive and without a legitimate purpose; and (2) Nikoonahad has failed to present non-speculative evidence that the damages he seeks are recoverable.

**A. Failure to Show Ill Motive and an Illegitimate Purpose**

**1. Licensing and Development of Nikoonahad's Technology**

Nikoonahad maintains that after licensing his technology, Rudolph sought to ensure that no royalty-bearing products would be developed from it prior to the expiration of the Agreement. SAC ¶ 54.  Indeed, Nikoonahad claims that Rudolph never intended to market the technology, and that Rudolph only was interested in marketing its own OCD product that it had been developing prior to entering the Agreement.  Pl. Opp. Mem. at 14.  Rudolph's alleged goal in paying the second installment to license Nikoonahad's patent was to keep the technology out of the hands of potential competitors until Rudolph was prepared to release its own product.  *Id.* Nikoonahad relies on Rudolph's product development documents as evidence of this alleged scheme.  *Id.*  In an OCD product plan created after the parties entered into the Agreement, Rudolph's only reference to Nikoonahad's technology was an instruction that the software should be compatible with Nikoonahad's technology if it were used in the future.  Johnson Decl., Ex. B at 138:4-17.  Likewise, a June 2007 product roadmap failed to reference Nikoonahad's technology.  Johnson Decl., Ex. C at 64:2-72:14; Ex. 166.

Nikoonahad also claims that Rudolph established no budget for development of his intellectual property (*Id.* at 27:3-17; Ex. 130);  that Rudolph allocated no time to consult with him about his new concept for "multi-azimuth" OCD products (*Id.* at at 159:3-162:3; Ex. 130); and that Rudolph closed all "multi-phi" items in December 2006 before the multi-azimuth plan had been distributed and before Rudolph paid the second installment under the Agreement.  *Id.* at 14:20-15:23; Ex. 162.  According to Nikoonahad, the lack of any effort to develop his technology after 2006 supports an inference that Rudolph obtained the technology only to keep it from competitors.

The Court already has concluded that the Agreement did not obligate Rudolph to develop

any products based on Nikoonahad's technology.  Third Dismissal Order at 5.  Nonetheless, Rudolph made a well-documented effort to develop the technology and bring it to market. Although Nikoonahad's counsel claimed at oral argument that Rudolph did not make any effort to develop the technology after paying the second installment for the License in late 2006, the record indicates otherwise.  After entering into the Agreement, Rudolph created a working group to manage the development of its OCD program.  Morath Decl. ¶ 12.   Meeting minutes for the group show the incorporation of Nikoonahad's technology into Rudolph's existing product roadmap.  *Id.*  Rudolph took steps to ensure that all future OCD products would be adaptable to Nikoonahad's technology.  *Id.* ¶ 13.  Rudolph even created a "mockup" of a product incorporating Nikoonahad's technology in order to evaluate its performance, and it included the technology on its roadmap for the second half of 2007 when making a presentation to a potential joint venture partner in early 2007.[2]  *Id.* ¶¶ 14, 17.

Nor did Rudolph fail to create a budget for the development of Nikoonahad's technology. As of December 8, 2006 Rudolph had budgeted $1.2 million for its OCD development program, an amount that included funds for the purchase of Nikoonahad's technology in the event that product development was successful.  Weibell Decl. Ex. 9.  The budget represented Rudolph's "single largest development program in 2007."  *Id.*

In early 2007, Rudolph experienced  a significant drop in revenue that prompted it to make budget cuts and reduce the amount of work given to outside consultants.  Morath Decl. ¶ 20.  After Nikoonahad complained that he had too few consulting hours during the first months of 2007, Rudolph developed an outline of tasks that would guarantee a specific amount of work each month if Nikoonahad would agree to lower his consulting fee.  Weibell Decl. Ex. 11.  By the first half of February 2007 Nikoonahad already was on track to earn more than $52,000 for the first quarter under his current rate structure.  *Id.*  Nonetheless, Nikoonahad refused to lower

---

[2] Christopher Morath, a Rudolph employee, stated that Rudolph identified three potential joint venture partners in 2007: IBM, Qimonda, and ProMOS. Morath Decl.  ¶ 19.  In a presentation made to ProMOS, Nikoonahad's multi-azimuth technology was listed on a product roadmap for the second half of 2007.  *Id.*

his fee. *Id.* Subsequently, the unit responsible for developing Nikoonahad's technology was reorganized, and the OCD development program was postponed along with several other programs. Morath Decl. ¶ 21.

Economic concerns were not Rudolph's only reason for postponing the OCD program. Rudolph had struggled to find customer interest in its OCD products and it had attempted unsuccessfully to form a joint venture to develop the OCD program. *Id.* ¶ 22. Additionally, reductions in the engineering staff made it impractical for Rudolph to tackle the technological issues associated with the development of Nikoonahad's OCD concept. *Id.* ¶ 23. If these reasons were merely a pretext for keeping the patent off the market in 2007, then it is unclear why Rudolph voluntarily surrendered its license three months early, effectively giving Nikoonahad the opportunity to shop his patent to its competitors. SAC ¶ 39, Ex. M.

The record reflects that Rudolph attempted to develop an OCD product that would incorporate Nikoonahad's concepts, and that legitimate business concerns caused Rudolph to terminate its development license with Nikoonahad. The implied covenant of good faith and fair dealing requires not that businesses act with benevolence in commercial transactions, but that they use reasonable efforts and due diligence. *Bradstreet Personnel Group, Inc. v. Wells Fargo Financial Leasing, Inc.*, No. 3212-03, 2005 WL 1252333, at *10 (N.J. Super. L. Div. May 2, 2005). The covenant should not be used to second guess a party's legitimate business strategy. Nor should it be construed so broadly as to "become an all-embracing statement of the parties' obligations under contract law, imposing unintended obligations upon parties and destroying the mutual benefits created by legally binding agreements." *Brunswick*, 864 A.2d at 399, (quoting *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 92 (3d Cir. 2000)). Nikoonahad has failed to raise a genuine issue of fact as to whether Rudolph acted without a legitimate purpose.

Nikoonahad also has failed to raise a genuine issue of fact as to whether Rudolph acted with ill motive in failing to develop his technology. His only evidence tending to prove ill motive involves a Rudolph employee, Greg Wolf ("Wolf"), who disliked Nikoonahad and who

7

allegedly influenced Rudolph's decisions with respect to Nikoonahad's technology.  Wolf's alleged antipathy stemmed from an event that occurred nine years before the parties entered into the Agreement and before Nikoonahad even worked as a consultant for Rudolph:  Nikoonahad claims that in 1997 Wolf helped block the development of a different product invented by Nikoonahad because the product infringed Rudolph's patents.  Nikoonahad Decl. ¶¶ 7-8.

After Nikoonahad began working with Rudolph pursuant to the Agreement, Wolf was assigned to oversee the proof of concept for developing Nikoonahad's technology.  Johnson Decl., Ex. B at 159:24-161:3; Ex. 143.  Nikoonahad asserts that Wolf rejected a plan for Nikoonahad to lead an offshore algorithm development team, despite the fact that the Agreement contemplated that Nikoonahad might lead such efforts.  Johnson Decl., Ex. D at 111:12-112:4; Ex. 127; Agmt ¶ 4.1.1.4.  In addition, Wolf allegedly attempted to reduce Nikoonahad's consulting hours and failed to allocate any consulting time to Nikoonahad's multi-azimuth OCD product.  Johnson Decl., Ex. A at 99:3-102:10; Ex. B 159:3-162:3; Ex. 130.  Most importantly, Nikoonahad contends that Wolf participated in the decision to terminate Nikoonahad's consulting work with Rudolph, citing email evidence that Wolf was invited to a meeting where Rudolph employees would "decide what to do with Mehrdad."  Johnson Decl., Ex. H.

Nikoonahad's characterizations of Wolf's role are not supported by the record.  There is no indication that Wolf sought to limit Nikoonahad's hours.  Instead, the actual record evidence shows only that Robert Loiterman, a Rudolph employee, did not recall any discussions about how Nikoonahad's consulting time would be structured.  Johnson Decl., Ex. A at 99:3-102:10.  The record clearly shows that Wolf did allocate consulting hours to Nikoonahad.  Indeed, Wolf specifically included time for Nikoonahad to consult on multi-azimuth OCD products, although the hours were listed as "TBD" (to be determined) because the time estimated still needed to be confirmed with Rudolph's engineering staff.  Johnson Decl., Ex. 130.  Likewise, there is no testimony to support the allegation that Wolf rejected Nikoonahad's algorithm development proposal.  Wolf never stated that he had "rejected" the proposal, noting only that he was "disappointed . . . [because] the timeframe was automatically too long to be of much help."

8

Johnson Decl., Ex. D at 111:12-112:4.  Finally, the fact that Wolf was invited to a May 2007 meeting to discuss further licensing and development of Nikoonahad's technology does not tend to show that Wolf's supposed ill-will caused Rudolph to terminate its consulting relationship with Nikoonahad; there is no evidence of what occurred at the meeting or even that Wolf actually attended.  Wolf left the company four months before Rudolph decided to forgo its option to purchase Nikoonahad's technology.  Morath Decl. ¶ 27.

Nikoonahad's theory that Rudolph harbored an ulterior motive depends entirely upon circumstantial evidence.  He notes correctly that under New Jersey law, "a person's intentions . . . need not be proved from what he said, but they may be inferred from all that he did and said, and from all the surrounding circumstances . . ."  *Mayflower Indus. v. Thor Corp.*, 15 N.J.Super. 139, 162 (Ch.Div. 1951).  However, "[t]he determinative inquiry is whether the evidence demonstrates the offered hypothesis as a rational inference . . ."  *Amerada Hess Corp. v. Quinn*, 362 A.2d 1258, 1265 (N.J. Super. L. Div. 1976).  Based on the sparse evidence Nikoonahad has provided, a jury could not rationally infer that Rudolph's decisions with respect to the licensing and development of his technology were driven not by legitimate business considerations, but instead by a nine-year-old grudge held by one of its employees.  Although Wolf might not have liked Nikoonahad,[3] that fact alone is insufficient to show that Rudolph had a scheme to thwart the development of Nikoonahad's technology.

### 2. Prosecution of Nikoonahad's Patent Application and Misappropriation

Nikoonahad also asserts that Rudolph exercised its control over his technology in an effort to suppress his intellectual property and deprive him of the ability to commercialize his technology.  SAC ¶ 53.  In December 2006, Rudolph requested that its patent attorneys, Harrington and Smith ("Harrington"), take responsibility for prosecuting the patent application

[3]A Rudolph employee, Christopher Morath, stated that Wolf and Nikoonahad "probably . . . didn't particularly like each other . . ." Johnson Decl., Ex. B at 25:3-9.  Although Rudolph argues that this statement is an inadmissible opinion under Fed. R. Evid. 602, 701, Morath's testimony reasonably establishes that he had personal knowledge of the interactions between Wolf and Nikoonahad, as he was both Director of Manufacturing and Vice President of Operations for the unit that oversaw Nikoonahad's technology in 2006 and 2007.

Case Number 5:08-cv-02290 JF (PVT)
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION TO FILE SUPPLEMENTAL DECLARATION (JFLC1)

that Nikoonahad had licensed to Rudolph under the Agreement.[4]  Nikoonahad Decl., ¶ 24.  The

U.S. Patent and Trademark Office ("USPTO") issued a non-final rejection of the patent on

January 14, 2008.  *Id.*  Nikoonahad alleges that the application was rejected because Rudolph

took no action to prosecute the patent, and that Rudolph never informed him of the rejection.  *Id.*

He claims that Rudolph failed also to notify him that his European patent application had been

withdrawn for failure to pay the filing and search fees associated with its prosecution.  *Id.*

Once again, Nikoonahad's allegations are unsupported by the evidence.  While Rudolph

did not *direct* Harrington's prosecution of the application, it did pay for the work done by

Harrington, thus indicating a clear interest in prosecuting the patent.  Johnson Decl., Ex. C at

100:19-25.  Nikoonahad presents no evidence that Rudolph concealed the USPTO's action from

him or even that Rudolph knew of the rejection before he did.  As Rudolph points out, the

rejection was publicly available on the USPTO website.  MSJ at 20:9-14.  A response to the

rejection was not due until July 14, 2008, and Nikoonahad was able to file a timely response.  In

fact, upon learning of the rejection, Nikoonahad worked exclusively with Harrington to

prosecute his application.  Nikoonahad Decl., ¶ 24.

It also is undisputed that Nikoonahad received timely notice from Harrington with

respect to his European patent application.  Weibell Decl. Ex. 19.  In May 2008, Harrington

wrote to Nikoonahad, informing him of the June 21, 2008 filing deadline and requesting

guidance on how to proceed.  *Id.*  Nikoonahad testified that he did not recall responding to this

letter or otherwise providing instructions to Harrington for the patent prosecution. Weibell Decl.

Ex. 2 at 492:9-494:18.

Nikoonahad has failed to identify sufficient evidence that Rudolph failed to pursue his

patent, much less that it acted with fraudulent intent.  Nikoonahad theorizes in his opposition

papers that Rudolph stonewalled his patent application in order to misappropriate his technology

for use in its own competing patent applications.  Nikoonahad Decl., ¶ 24.  However, this

---

[4] Nikoonahad's patent application was filed by his original counsel in December 2005. Weibell Decl. Ex. 17.

Case Number 5:08-cv-02290 JF (PVT)
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
MOTION TO FILE SUPPLEMENTAL DECLARATION
(JFLC1)

1    allegation does not appear in the complaint, and it relates to conduct that pre-dates the

2    Agreement at issue.

3        Nikoonahad alleges that Rudolph improperly incorporated his technology into three of its

4    own patent applications that were filed in 2007.  Nikoonahad Decl., ¶¶ 21, 22, 23.  He claims

5    that he shared the allegedly misappropriated information between May and July in 2006.  *Id.*

6    However, the parties did not enter into the Agreement until September 12, 2006.[5]  In an action

7    for breach of the implied covenant of good faith and fair dealing, a plaintiff cannot prove

8    fraudulent intent by pointing to conduct that falls outside of the contract.  *See AccuSoft Corp. v.*

9    *Palo*, 237 F.3d 31, 45 (1st Cir. 2001) ("the covenant applies only to conduct during performance

10   of the contract, not to conduct occurring prior to the contract's existence.")

11       In an effort to cure this deficiency, Nikoonahad requests to submit a supplemental

12   declaration that Rudolph misused information shared by Nikoonahad during the period of the

13   Agreement.[6]  However, even if the Court were to accept the declaration, it shows only that

14   Nikoonahad and Rudolph both submitted patent applications to the USPTO addressing the topic

15   of scatterometry and that Nikoonahad shared his work product with Rudolph prior to the date of

16   Rudolph's application.  This fact alone does not point to misappropriation.  Nikoonahad does not

17   identify evidence–for example a side-by-side comparison of the specifications–tending to show

18   that Rudolph's application was derived from his own.  Accordingly, Nikoonahad's request to file

19   a supplemental declaration will be denied.

20

21   **B. Failure to Prove Damages**

22

23   _____

24       [5] Nikoonahad also alleges that Greg Wolf submitted an invention disclosure to Rudolph
     based on an invention that Nikoonahad shared with Wolf in 2005.  Pl. Opp. Mem. at 11:1-4.  For
     obvious reasons, this also pre-dates the Agreement at issue.

25

26       [6] Nikoonahad asserts that he submitted a provisional application to the USPTO on
     February 8, 2007 and shared this application with Rudolph as required by the Agreement.
27   Nikoonahad Sup. Decl., ¶¶ 2-3.  According to Nikoonahad, a significant portion of this material
     was used in a Rudolph application that was filed several months later in July 2007.  *Id.* at ¶ 5.

28

Case Number 5:08-cv-02290 JF (PVT)
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
MOTION TO FILE SUPPLEMENTAL DECLARATION
(JFLC1)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Because it concludes that there are no genuine issues of material fact with respect to liability, the Court does not address Rudolph's argument that Nikoonahad has failed to prove damages.

## IV.  ORDER

Good cause therefor appearing, Rudolph's motion for summary judgment is GRANTED. Nikoonahad's motion to file a supplemental declaration in support of his opposition to the motion for summary judgment is DENIED.  The Clerk of the Court shall close the file.

**IT IS SO ORDERED.**

DATED: 10/27/10

_____
JEREMY FOGEL
United States District Judge

Case Number 5:08-cv-02290 JF (PVT)
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
MOTION TO FILE SUPPLEMENTAL DECLARATION
(JFLC1)